201 N.J. Super. 267 (1985)
493 A.2d 11
EDGEWATER INVESTMENT ASSOCIATES, A NEW JERSEY PARTNERSHIP, PLAINTIFF-RESPONDENT, CROSS-APPELLANT,
v.
BOROUGH OF EDGEWATER, MARTIN CONNETT, ET AL., DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued March 19, 1985.
Decided April 22, 1985.
*270 Before Judges MICHELS, PETRELLA and BAIME.
Robert T. Regan argued the cause for appellants (McGuire & Regan, attorneys; Robert T. Regan, on the brief).
Raymond R. Wiss argued the cause for respondent (Winne, Banta, Rizzi, Hetherington & Basralian, attorneys; Raymond R. Wiss, of counsel; Kevin P. Cooke, on the brief).
*271 Robert M. Jaworski, Deputy Attorney General, argued amicus curiae on behalf of intervenor, State of New Jersey (Irwin I. Kimmelman, Attorney General of New Jersey, attorney; James J. Ciancia, Assistant Attorney General, of counsel; Robert M. Jaworski, on the brief).
The opinion of the court was delivered by BAIME, J.A.D.
This case presents novel questions pertaining to the constitutionality and interpretation of the Senior Citizens and Disabled Protected Tenancy Act. N.J.S.A. 2A:18-61.22 et seq. At issue is whether retroactive application of the statutory scheme pursuant to N.J.S.A. 2A:18-61.11d violates the Federal[1] or State[2] constitutional prohibition against the impairment of contracts. A somewhat related question is whether the protection accorded to senior citizens and disabled persons under the Act so pervasively affects the owner's property interests so as to constitute a governmental taking without just compensation under the Fourteenth Amendment. Other issues concern the statutory qualifications for protected tenancy status. More specifically, these questions relate to whether the gross or net business income of the applicant is to be considered in determining whether he or she satisfies the statutory requisites set forth in N.J.S.A. 2A:18-61.28c. A subsidiary issue pertains to the appropriate time period for evaluation of the applicant's qualifications.
We hold that the statutory regulation of condominium conversions constitutes a reasonable exercise of the State's police powers and is not violative of the owner's freedom of contract under the Federal and State constitutions. In a similar vein, we conclude that application of the statutory scheme under the facts presented here does not constitute a taking of property *272 without just compensation. We are entirely satisfied that the Act is immune from constitutional attack. In our view, the statute must be considered against the backdrop of the beneficent objectives and goals sought to be achieved. We, thus, construe the statute as requiring that the applicant's net rather than gross business income be considered in determining his or her qualifications for protected tenancy status. In that regard, we find that the tenants' annual household income in this case is to be determined by utilizing the last full calendar year prior to their applications.
The essential facts are not in dispute. Prior to May 26, 1981, Hudson Harbour Condominium was a rental apartment complex consisting of 251 units. The building was owned by Hudson Harbour Associates, plaintiff's predecessor in title. All of the defendants resided in the complex as tenants for a substantial period of time before January 5, 1981, when the process of converting the building from apartments to condominiums was commenced. On that date, the Department of Community Affairs approved the condominium offering plan and registered the premises for conversion. Shortly thereafter, a notice of intention to convert was served upon all of the tenants. In accordance with the Anti-Eviction Act, the tenants subsequently received notices to quit and a demand for possession. On May 26, 1981, the master deed was filed, thereby perfecting the conversion.
Thereafter, on July 27, 1981, the Senior Citizens and Disabled Protected Tenancy Act (L. 1981, c. 226) became effective. The Act effectuated several important modifications in the conversion and eviction processes, and will be described in detail subsequently. Suffice it to say, the Department immediately notified Hudson Harbour Associates and other condominium converters that they would be required to serve upon all prospective purchasers and existing tenants a notice of protected tenancy in the form prescribed by N.J.S.A. 2A:18-61.27. In addition, Hudson Harbour Associates amended its public offering statement to include a warning to future purchasers of the *273 possibility that existing tenants could be granted protected status.
On January 19, 1982, Hudson Harbour Associates sold the units to plaintiff. The deeds of conveyance were recorded shortly thereafter. Although the record is somewhat ambiguous, it would appear that Hudson Harbour Associates and plaintiff are related business entities. It is clear that Robert K. Raynor, the general partner of Hudson Harbour Associates, continues to serve in that capacity with respect to the plaintiff.
On December 15, 1982, plaintiff instituted a declaratory judgment action against defendants and other tenants. In essence, plaintiff contended that retroactive application of the Act would constitute an impairment of its vested contract rights. So too, it claimed that the regulatory scheme was so pervasive as to constitute a governmental taking contrary to due process. Plaintiff also argued that defendants did not qualify and, thus, should not be accorded protected tenancy status. Defendants filed an answer and counterclaim. The matter was submitted to the trial judge in a series of motions and cross-motions for summary judgment. Additionally, the trial court conducted limited plenary hearings with respect to several of the issues.
The court's decisions were memorialized in a comprehensive written opinion. Succinctly stated, the trial judge found that retroactive application of the Act did not violate the constitutional prohibitions against impairment of contractual obligations. The judge also determined that the statute constituted a proper exercise of the State's police powers and did not contravene plaintiff's right to due process. Finally, the court decided that defendants' gross business incomes for the calendar year prior to their applications for protected tenancy status were to be utilized in resolving questions pertaining to whether they satisfied the statutory criteria.
Defendants appeal upon the basis that the trial judge erred in considering their gross business incomes in determining their qualifications for protected tenancy status. They also claim *274 that the court incorrectly utilized the calendar year preceding their applications in determining whether they satisfied the financial criteria set forth in the statute. Plaintiff cross-appeals from that portion of the judgment holding that there was no constitutional impediment to retroactive application of the Act.

I
A brief description of the Act and related statutory provisions is necessary for a complete understanding of the questions presented. The Act is part of a comprehensive legislative effort to regulate condominium conversions. Prior to 1981, an owner wishing to convert rental premises was required by the Anti-Eviction Act to serve affected tenants with a notice of termination three years before commencing summary dispossess proceedings. N.J.S.A. 2A:18-61.1k and N.J.S.A. 2A:18-61.2g. Following receipt of a notice to quit, the tenant could compel the owner to offer comparable housing. N.J.S.A. 2A:18-61.11a. In the absence of a successful relocation under that alternative, the court was empowered to issue up to five one-year stays of eviction. After the first stay, however, the owner could foreclose further applications by providing the tenant with "hardship relocation compensation" equal to five months rent. N.J.S.A. 2A:18-61.11a and c. As a practical matter, these provisions granted the tenant either a five or eight year grace period depending upon whether the owner exercised his option to provide hardship relocation compensation.
Other statutes further regulated condominium conversions. For example, the Condominium Act, N.J.S.A. 46:8B-1 et seq., required the filing of a master deed. N.J.S.A. 46:8B-8. Other provisions regulated the sale of individual units and the rights of purchasers thereafter. N.J.S.A. 46:8B-4 and N.J.S.A. 45:22A-21 et seq. Under the Disclosure Act, N.J.S.A. 45:22A-21 et seq., the owner was required to file a public offering *275 statement with the Department of Community Affairs which was authorized to investigate the application. N.J.S.A. 45:22A-29 and 30. Within a limited period, the tenant was to be given the right of first refusal. N.J.S.A. 2A:18-61.8.
We refer to these statutory provisions merely to underscore the fact that the Senior Citizens and Disabled Protected Tenancy Act was not adopted in a legislative or regulatory vacuum. Nor does the Act serve to repeal any of the statutory protections accorded to tenants and prospective purchasers to which we have alluded. Rather, the statutory scheme was designed to supplement these provisions by providing special protection to senior citizens and the disabled.
This objective is clearly articulated in the legislative findings and declarations which recite that "forced eviction and relocation of elderly persons ... [often] harm [their] mental and physical health ... and affect adversely the social, economic and cultural characteristics" of New Jersey communities. N.J.S.A. 2A:18-61.23. In order to eliminate these problems, the Act grants "protected tenancy status" to eligible senior citizens and disabled tenants. N.J.S.A. 2A:18-61.25. The Act defines a "senior citizen tenant" as an individual who attained the age of 62 or over on the date of recordation of the master deed or the surviving spouse of such a tenant. N.J.S.A. 2A:18-61.24a.[3] In order to be eligible, the statute requires that the tenant must have occupied a unit as a principal residence for the prior two years. Ibid. Further, the tenant must establish that his or her "annual household income" does not exceed three times the county per capita personal income level. N.J.S.A. 2A:18-61.24c. Under the Act, a tenant who qualifies is immune from eviction for a period of 40 years. N.J.S.A. 2A:18-61.1k and N.J.S.A. 2A:18-61.24h. He may lose such protection only in the event that the unit no longer serves as his principal residence or his *276 annual household income exceeds three times the most recently reported county per capita personal income level. N.J.S.A. 2A:18-61.32. However, the Act authorizes the owner to reasonably increase the rent over this period. Nevertheless, such increases may not be attributable to the additional costs that might arise by virtue of the conversion. N.J.S.A. 2A:18-61.31.
Central to the constitutional questions presented is the statutory provision which under some circumstances permits retroactive application. More specifically, N.J.S.A. 2A:18-61.11d states in pertinent part as follows:
On or after the effective date of the "Senior Citizens and Disabled Protected Tenancy Act," P.L. [1981], c. [226] (C. [2A:18-61.22 et seq.]), notwithstanding the provisions of subsection a. of this section, where the court has jurisdiction pursuant to that subsection, whether by virtue of the authorization by the court of a stay of eviction or by virtue of any other proceedings required or instituted pursuant to P.L. 1974, c. 49 (C. 2A:18-61.1 et seq.) or P.L. 1975, c. 311 (C. 2A:18-61.6 et seq.), or in any action for declaratory judgment, the court may invoke some or all of the provisions of the "Senior Citizens and Disabled Protected Tenancy Act" and grant to a tenant, pursuant to that amendatory and supplementary act, a protected tenancy period upon the court's determination that:
(1) The tenant would otherwise qualify as a senior citizen tenant or disabled tenant pursuant to that amendatory and supplementary act, except that the building or structure in which the dwelling unit is located was converted prior to the effective date of that amendatory and supplementary act; and
(2) The granting of the protected tenancy period as applied to the tenant, giving particular consideration to whether a unit was sold on or before the date that the amendatory and supplementary act takes effect to a bona fide individual purchaser who intended personally to occupy the unit, would not be violative of concepts of fundamental fairness or due process. Where a court declines to grant a protected tenancy status, it shall nevertheless order such hardships stays as authorized by subsections a. and b. of this section until comparable relocation housing is provided. The hardship relocation compensation alternative of subsection c. of this section shall not be applicable in this situation.
The effect of that statute is to confer upon the judiciary the discretionary authority to recognize protected tenancy status for senior citizens even where the conversion occurred prior to the effective date of the Act. If the court declines to grant protected tenancy status, it may nonetheless issue up to five one-year stays unless comparable rental housing is provided. *277 However, the owner does not have the option to provide hardship relocation compensation.

II
We first address plaintiff's argument that retroactive application of the Act violates the constitutional proscription against impairment of contracts. Similar prohibitions appear in the United States and New Jersey constitutions. Despite the seemingly unambiguous language in both,[4] the United States Supreme Court has stated that the contract clause "is not ... the Draconian provision that its words might seem to imply." Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 240, 98 S.Ct. 2716, 2720, 57 L.Ed.2d 727, 733 (1978). It has been said that "literalism in the construction of the contract clause... would make it destructive of the public interest by depriving the State of its prerogative of self-protection." W.B. Worthen Co. v. Thomas, 292 U.S. 426, 433, 54 S.Ct. 816, 818, 78 L.Ed. 1344, 1347 (1934). Rather, the State retains residual authority to enact laws "to safeguard the vital interests" of its people. Home Building & Loan Ass'n v. Blaisdell, 290 U.S. 398, 434, 54 S.Ct. 231, 238, 78 L.Ed. 413, 427 (1934). See also State Dep't of Environ. Protect. v. Ventron Corp., 94 N.J. 473, 498-499 (1983); Fidelity Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277, 286-287 (1981), app. dism. 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981); N.J. Sports & Exposition Auth. v. McCrane, 61 N.J. 1, 26 (1972), app. dism. sub nom. Borough of East Rutherford v. N.J. Sports & Exposition Auth., 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1973). The issue therefore is not whether the legislation "affects contracts incidentally or directly or indirectly...." Home Building & Loan *278 Ass'n v. Blaisdell, supra, 290 U.S. at 438, 54 S.Ct. at 239, 240, 78 L.Ed. at 429. Rather, the appropriate inquiry is "whether the legislation is addressed to a legitimate end and the measures taken are reasonable and appropriate...." Ibid.
Recently, the United States Supreme Court had occasion to further refine the parameters of judicial review with respect to a challenge to the constitutional validity of a statute on the basis of the contract clause. In Energy Reserves Group, Inc. v. Kansas Power & Light Co., 459 U.S. 400, 103 S.Ct. 697, 74 L.Ed.2d 569 (1983), the Court developed a three-pronged test. "The threshold inquiry is `whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'" Id. 459 U.S. at 411, 103 S.Ct. at 705, 74 L.Ed.2d at 580 (quoting Allied Structural Steel Co. v. Spannaus, supra, 438 U.S. at 244, 98 S.Ct. at 2722, 57 L.Ed.2d at 736). If the regulation effects a substantial impairment, the State, in justification, must establish "a significant and legitimate public purpose" underlying the challenged statute. Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra, 459 U.S. at 411, 103 S.Ct. at 705, 74 L.Ed.2d at 581. Once a legitimate public purpose has been identified, the inquiry is to focus upon "whether the adjustment of the rights and responsibilities of contracting parties [is based] upon reasonable conditions" and is sufficiently related to the appropriate governmental objective. Id., 459 U.S. at 412, 103 S.Ct. at 705, 74 L.Ed.2d at 581. See also United Trust Co. v. New Jersey, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92, 109-110 (1977).
Applying these standards here, we are entirely satisfied that the Act is not violative of the contract clause. Initially, we find that the statutory scheme does not operate as a substantial impairment of vested rights. In determining the extent of the impairment, we cannot ignore the State's long history of regulation pertaining to the housing industry. See Energy Reserves Group, Inc. v. Kansas Power & Light Co., supra, 459 U.S. at 411, 103 S.Ct. at 705, 74 L.Ed.2d at 580; Veix v. Sixth Ward *279 Bldg. & Loan Ass'n, 310 U.S. 32, 38, 60 S.Ct. 792, 794, 84 L.Ed. 1061, 1065 (1940); Hudson Water Co. v. McCarter, 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828, 832 (1908). Within that context we perceive the Act as a mere enlargement or extension of preexisting statutory protections historically granted to tenants.
Even were we to conclude, however, that the Act substantially impairs the rights of owners wishing to convert their rental property to condominiums, we would nonetheless find that the remedial purpose of protecting the mental and physical health of New Jersey's elderly citizens constitutes an entirely appropriate governmental objective. Further, there exists a real and substantial relationship between the Act and the effectuation of the legislative purpose. In Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., 80 N.J. 6 (1976), our Supreme Court observed that "[a]s a consequence of declining birth rates and longer life expectancies, the elderly are increasing both in absolute numbers and in relative proportion to the total population." Id. at 266. Against this backdrop of sharp demographic changes, public attention has increasingly focused upon the problems of the aged. Clearly, the lack of affordable housing cannot be ignored. Although the problem exists nationally, see 2 White House Conference on Aging, Toward a National Policy on Aging, pp. 29-36 (1971); President's Task Force on Aging, Toward a Brighter Future for the Elderly, pp. 38-40 (1970), perhaps it is more acute in New Jersey because of our long history of housing crises. New Jersey Office on Aging, A Community Guide: Housing New Jersey's Elderly (1971). See also Inganamort v. Fort Lee, 62 N.J. 521 (1973); Marini v. Ireland, 56 N.J. 130 (1970); Stamboulos v. McKee, 134 N.J. Super. 567, 572 (App.Div. 1975). In part, the need of the elderly for affordable housing "results from the fixed and limited incomes upon which many older persons are dependent." Taxpayers Ass'n of Weymouth Tp. v. Weymouth Tp., supra 80 N.J. at 25. Many others "must devote a disproportionate amount of their available resources to housing costs." Id. at *280 25. "Because of these special demands and the demographic trends discussed above, there now exists a critical shortage of housing suitable to meet the needs and desires of the elderly." Id. at 29. We are, thus, convinced that the remedial purpose underlying the statutory scheme is a highly appropriate governmental goal and that there is a substantial nexus between that objective and the means utilized to accomplish it. Cf. Stamboulos v. McKee, supra, 134 N.J. Super. at 575; Albigese v. Jersey City, 127 N.J. Super. 101, 112-113 (Law Div. 1974), mod. on other grounds 129 N.J. Super. 567 (App.Div. 1974).
We note that the Court of Appeals for the Third Circuit recently considered and rejected the identical argument advanced by plaintiff here. Troy Ltd. v. Renna, 727 F.2d 287 (3 Cir.1984). We are in complete accord with the Third Circuit's opinion. We also note the enlarged degree of deference accorded by the United States Supreme Court to state economic and social legislation affecting private contract rights. We are satisfied that whatever incidental effects the legislation may have on the rights of property owners, they are far outweighed by the salutary purpose underlying the statutory scheme.

III
We reject plaintiff's claim that the Act constitutes a taking of property without just compensation for many of the same reasons. The applicable principles were recently reviewed by the United States Supreme Court in Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). There, the Court distinguished between statutes compelling or authorizing a physical invasion of property and those merely regulating its use. 458 U.S. at 427, 102 S.Ct. at 3171, 73 L.Ed.2d at 877. The Court noted that a permanent physical occupation of property constitutes "a government action of such a unique character that it is a taking without regard to other factors that a court might ordinarily examine." 458 U.S. at 432, 102 S.Ct. at 3174, 73 L.Ed.2d at *281 880. See also Michelman, "Property, Utility and Fairness: Comments on the Ethical Foundations of `Just Compensation' Law," 80 Harv.L.Rev. 1165, 1184-1190 (1967). In contrast, the Court emphasized the "broad power [of the states] to regulate housing conditions in general and the landlord-tenant relationship in particular without paying compensation for all economic injuries that such regulation entails." 458 U.S. at 440, 102 S.Ct. at 3178, 73 L.Ed.2d at 885. See also Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964); Queenside Hills Realty Co. v. Saxl, 328 U.S. 80, 66 S.Ct. 850, 90 L.Ed. 1096 (1946); Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892 (1944); Home Building & Loan Ass'n v. Blaisdell, supra; Edgar A. Levy Leasing Co. v. Siegel, 258 U.S. 242, 42 S.Ct. 289, 66 L.Ed. 595 (1922); Block v. Hirsh, 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921).
In our view, the statutory scheme constitutes a valid exercise of the State's police powers. "The range of the State's discretion in promoting the security and well-being of the public `accords with the subject of its exercise.'" Reingold v. Harper, 6 N.J. 182, 193-194 (1951) (quoting Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375 (1932)). "Judicial interposition may be had only where there is no real or substantial relation between the legislative act and a valid public interest under the police power or the measure is, beyond all question, a palpable invasion of rights secured by the organic law." Reingold v. Harper, supra, 6 N.J. at 195. As noted, we perceive compelling public policies supporting the statutory scheme and minimal interference with the owner's contract rights in that context. See Troy Ltd. v. Renna, supra at 301.
Further, we discern no constitutional imperative requiring that a property owner be permitted to exploit his interest in such a way as to produce maximum profits. In the area of zoning and regulatory action, both the federal and state courts have addressed the issue of whether there has been an unconstitutional *282 taking in terms of the extent to which the owner has been deprived of all reasonable uses of his property.[5]See, e.g., Agins v. City of Tiburon, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); Goldblatt v. Town of Hempstead, 369 U.S. 590, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962); Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926); AMG Associates v. Tp. of Springfield, 65 N.J. 101 (1974); Spiegle v. Beach Haven, 46 N.J. 479 (1966), cert. den. 385 U.S. 831, 87 S.Ct. 63, 17 L.Ed.2d 64 (1966). See also Rothman v. Rothman, 65 N.J. 219, 225-228 (1974); Hochman, "The Supreme Court and the Constitutionality of Retroactive Legislation," 73 Harv.L.Rev. 692, 697-711 (1960). Measured against these standards, we are satisfied that the statute does not effect a taking without just compensation.

IV
We next turn to questions concerning the interpretation of the statutory qualifications for protected tenancy status. Initially, we reject defendants' argument that where the Act is applied retroactively the last calendar year prior to perfection *283 and recordation of the conversion should be utilized in determining whether the tenant's annual household income exceeds three times the county per capita income level under N.J.S.A. 2A:18-61.28c. N.J.S.A. 2A:18-61.24c provides that the appropriate time period for determining the tenant's income is the "last full calendar year at the time [he] applies for" protected status. Had the Act been in effect at the time Hudson Harbour Associates sought to convert the rental units to condominiums, it would have been required to provide the local administrative agency with a notice of intention. In turn, the agency would have advised the tenants of their right to seek protection under the Act and would have provided them with the appropriate application form. N.J.S.A. 2A:18-61.27. Further, no registration of conversion or recording could have been accomplished until after the administrative agency had rendered a ruling as to the eligibility of the applying tenants for protected status. N.J.S.A. 2A:18-61.29 and 61.30. Defendants, thus, argue that had the Act been in place at the time of the conversion they would have made application in 1981, and the qualifying year for measuring income would have been 1980.
We disagree. Clearly, the Legislature intended that the municipal agency was to consider the most recent annual income figures in determining the qualifications of the tenant. It is reasonable to assume that the tenant's most current income level best reflects whether he needs the protection afforded by the Act. Hence, it would be anomalous to conclude that the full calendar year prior to the conversion be utilized in all cases in which the Act is to be applied retroactively. Such a rule would compel the agency to consider information which would often be stale and out of date. We reject that approach.
Here, defendants applied for protected status immediately after they were advised of their right to do so. We are, thus, satisfied that the trial judge properly considered defendants' respective incomes during the full calendar year prior to their applications.

*284 V
Defendants next contend that the trial judge erred when he included gross business income in determining their financial qualifications. They argue that it was incumbent upon the court to consider the actual net profits derived from their respective businesses. The essential thrust of their claim is that the trial judge's construction of the Act ignores the plainly expressed legislative purpose to protect the rights of elderly persons of limited means.
We agree. N.J.S.A. 2A:18-61.24c defines "annual household income" as the "total income [received] from all sources ... whether or not such income is subject to taxation...." The statute is not a model of clarity. Nevertheless, it must be construed consonant with the legislative purpose. In our view, the statutory definition was designed to provide protection to elderly tenants depending upon their actual disposable income. Hence, the term includes income derived from all sources, whether taxable or not. To construe the statute as encompassing gross business income without reference to legitimate operating expenses sacrifices accuracy and fairness for the sake of simplicity. Such an interpretation precludes the administrative agency from fairly assessing the tenant's actual financial situation.
The inequity resulting from the trial court's construction of the Act is patent. A tenant who operates a business at a loss or derives little profit and has no other significant income may nevertheless be found disqualified on the basis of a highly unrealistic and artificial gross income figure. Such an individual may actually earn less than another tenant who qualifies based upon a fixed income. This approach is plainly inconsistent with the articulated mandate that the legislation is remedial and is to be "liberally construed." N.J.S.A. 2A:18-61.39.
We thus construe the statute as requiring that the tenant's net rather than gross business income be considered in assessing his financial qualifications for protected tenancy status. *285 Our interpretation comports with the plainly expressed statutory design and is in accord with previously enacted legislation. We note in that regard that the New Jersey Gross Income Tax Act, N.J.S.A. 54A:5-1 et seq., defines income in terms of net business profits. See N.J.S.A. 54A:5-1b. In establishing the financial criteria for protected tenancy status, we can fairly assume that the Legislature was "thoroughly conversant" and familiar with its own statutory definitions. Barringer v. Miele, 6 N.J. 139, 144 (1951). See also Quaremba v. Allan, 67 N.J. 1, 14 (1975); Brewer v. Porch, 53 N.J. 167, 174 (1969); Petrozzino v. Monroe Calculating Mach. Co., Inc., 47 N.J. 577, 582, n. 2 (1966); Petition of Keogh-Dwyer, 45 N.J. 117, 120 (1965); Eckert v. N.J. Highway Dep't, 1 N.J. 474, 479 (1949).
Lastly, we note that the Department of Community Affairs has promulgated regulations defining income in accordance with the New Jersey Gross Income Tax Act. See N.J.A.C. 5:24-2.3(c). Our Supreme Court recently emphasized that "an administrative agency's interpretation of a statute that it is charged with enforcing is entitled to due deference." In re Bridgewater Tp., 95 N.J. 235, 244 (1984). See also In re Application of Saddle River, 71 N.J. 14, 24 (1976). That principle clearly applies here. In sum, we hold that the applicant's net business income is to be utilized in determining whether he qualifies for protected tenancy status.

VI
The remaining issues do not require extended discussion. We concur in the trial judge's conclusion that an applicant need not be the tenant of record. The statute merely requires occupancy for a two year period. N.J.S.A. 2A:18-61.28d. Further, a move within the apartment complex does not preclude eligibility. Both N.J.S.A. 2A:18-61.24a and N.J.S.A. 2A:18-61.28d militate against such a construction. Finally, there is absolutely no support for an award of counsel fees here. See *286 R. 4:42-9(a)(2). See also State Dep't of Environ. Protect. v. Ventron Corp., supra, 94 N.J. at 504. The trial judge properly denied plaintiff's request.

VII
The judgment of the Superior Court, Law Division is affirmed in part and reversed in part. The matter is remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.
NOTES
[1] U.S. Const. Art. I, § 10, cl. 1.
[2] N.J. Const. (1947), Art. IV, § VII, par. 3.
[3] A recent amendment now requires that the surviving spouse must have been at least 50 years of age at the time of the condominium conversion. N.J.S.A. 2A:18-61.24a.
[4] Our research discloses nothing to indicate that New Jersey applies a different or narrower construction of the contract clause than that utilized by the United States Supreme Court. See Fidelity Union Trust Co. v. N.J. Highway Auth., 85 N.J. 277, 299 (1981), app. dism. 454 U.S. 804, 102 S.Ct. 76, 70 L.Ed.2d 73 (1981). See also P.T. & L. Const. Co. v. Commissioner, 60 N.J. 308, 313 (1972).
[5] Our conclusion is buttressed by the United States Supreme Court's recent summary dismissal for want of a substantial federal question of the appeal in Fresh Pond Shopping Center, Inc. v. Acheson Callahan, ___ U.S. ___, 104 S.Ct. 218, 78 L.Ed.2d 215 (1983). There, the Supreme Judicial Court of Massachusetts had upheld a municipal ordinance which compelled an owner to apply for permission from the local rent control board to remove occupied rental property from the housing market. Fresh Pond Shopping Center, Inc., v. Acheson Callahan, 388 Mass. 1051, 446 N.E.2d 1060 (Sup.Jud.Ct. 1983). The Supreme Court summarily dismissed the appeal. Justice Renquist filed a dissenting opinion. See also Flynn v. City of Cambridge, 383 Mass. 152, 418 N.E.2d 335 (Sup.Jud.Ct. 1981). See also Grace v. Town of Brookline, 379 Mass. 43, 399 N.E.2d 1038 (Sup.Jud.Ct. 1979) where the Massachusetts Supreme Judicial Court held that a condominium developer, unit owner and prospective purchaser had failed to sustain their burden of proving that a municipal ordinance generally barring evictions due to conversions constitutionally deprived them of vested property rights.